**KIEWIT CONSTRUCTION COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–666C.

United States Court of Federal Claims.

April 22, 2003.

Douglas L. Patin, Washington, D.C., for plaintiff.

Janene M. Marasciullo, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., with whom were Mark A. Melnick, Assistant Director, David M. Cohen, Director, and David W. Ogden, Acting Assistant Attorney General, for defendant.

## OPINION

SMITH, Senior Judge.

This matter is before the court on Defendant's motions for summary judgment and to dismiss Plaintiff's claim. Plaintiff seeks an equitable adjustment pursuant to the Contract Disputes Act ("CDA") on two counts.[1] Count One of Plaintiff's complaint alleges that the design specifications provided in a government construction contract were defective. Count Two alleges that site conditions at the construction work site differed materially from actual site conditions, resulting in damages to Plaintiff. Defendant contends that Count One should be dismissed pursuant to Rules of the Court of Federal Claims ("RCFC") 12(b)(1), or in the alternative, that summary judgment should be entered in favor of the United States on Count

---

1. 41 U.S.C. §§ 601–13 (2002).

One, and that we should grant summary judgment on Count Two pursuant to RCFC 56(c) in favor of Defendant. After reviewing the briefs and hearing oral argument, the court hereby GRANTS Defendant's motions.

## FACTS

This dispute arises from a written contract between Plaintiff, Kiewit Construction Company ("Kiewit"), and the Huntington District of the Army Corps of Engineers (the "Corps") regarding the construction of the Winfield Locks and Dam on the Kanawha River in West Virginia. The Corps had solicited contractors to build a lock[2] and gate bay[3] to the Winfield Locks and Dam in three phases: Phase I, Phase IIA, and Phase IIB. A different contractor than the Plaintiff completed Phase I, which consisted primarily of the construction of cofferdam[4] cells up- and downstream of the existing lock walls. The present matter concerns the second phase of the project, Phase IIA.

Phase IIA involved dewatering the work site by excavating a designated area to form a new cofferdam, and building and implementing a dewatering system consisting of a groundwater and surface water control system (the "dewatering system") to lower the water table within the excavation area. The dewatering system consisted of sheet pile cutoff walls,[5] a slurry trench cutoff wall[6] situated landward of the designated work area, piezometers, predrainage wells, ditching and sandbags, and sump pumps. The Corps intended the dewatering system to keep water seepage from interfering with the timely completion of the new cofferdam. Thus, on the side of the excavation facing the Kanawha River, the existing locks and cofferdam cells installed in Phase I would keep river water from entering the excavation area. On the side of the excavation facing the ground away from the Kanawha River, the slurry trench, which connected the previously built upstream and downstream cofferdam cells, would prevent groundwater from entering the excavation area. The dewatering system was designed to allow the contractor to lower the groundwater inside of the enclosed space to within five feet of the floor of the excavation area. Contract, § 2C, ¶ 8.1.1(6).

On May 23, 1993, the Corps and Kiewit entered a contract (the "Contract") requiring Kiewit to perform Phase IIA. The Contract included four provisions especially relevant to the present case. First, the Contract included detailed information regarding soil and subsurface conditions in the designated work area, including boring logs and references to available pumping test data. Contract, § 2C, ¶¶ 5.4–5.6.1.

Second, the Contract included extensive specifications providing Kiewit with mandatory minimum performance and design information regarding the dewatering system to serve as a basis for Kiewit's bid on the Contract. Contract, § 2C, ¶ 8. In addition to these minimum specifications, the Contract noted that if the contractor considered additional facilities necessary to fulfill the contract, the extras "shall be included in the Contractor's Groundwater Control Plan or shall be added as required or as directed by the Contracting Officer ... at no additional cost to the Government." Contract, § 2C, ¶ 8.1.2.

Third, the Contract listed "Predrainage Design Assumptions" underlying the design

---

2. A lock is a "[c]hamber in a canal or river with gates on each end through which vessels can pass up- or downstream and be raised or lowered to a new elevation." THE WILEY DICTIONARY OF CIVIL ENGINEERING AND CONSTRUCTION 351 (1995).

3. A bay is a "[s]mall, well-defined area of concrete laid at one time in the course of placing large areas such as floors, pavements, or runways." Id. at 54.

4. A cofferdam is a "[s]tructure that enables construction work to be carried out below water level." Id. at 124.

5. Sheet pile cutoff walls refers to "[p]ile in the form of a plank driven in close contact or interlocking with others to provide a tight wall to resist the lateral pressure of water, adjacent earth, or other materials." Id. at 424.

6. A slurry trench is a "[n]arrow trench with vertical, unshored walls, in which caving or sloughing of the earth walls is prevented by the hydrostatic pressure of the slurry or mud with which the trench is filled." Id. at 534. A cutoff wall is a "[s]tructure used to stop or divert a flow of water." Id. at 162.

of the prescribed minimum dewatering system. These fundamental assumptions included statements that "the bottom of the cofferdam cells and the downstream guide wall and landside lock wall form a tight contact with the bedrock, that the sheet pile cutoff walls and slurry trench cutoff wall will prevent any significant seepage into the work area, and that the bedrock at the sight is tight." Contract, § 2C, ¶ 5.7. However, the contract explicitly cautioned that "*[t]hese assumptions may or may not be completely valid,*" and that "it shall be the Contractor's sole responsibility to control and pump any water that may leak through the existing structures, the cutoff wall, and/or from the bedrock, for whatever conditions that may exist." *Id.* (emphasis in original).

Fourth, the contract included a standard "Differing Site Conditions" clause.[7] *See* Contract, § I, ¶ I.73. Differing Site Conditions clauses provide guidelines for private contractors and government contracting officers in the investigation of contractors' claims of discrepancies between the physical conditions at work sites and the description of those work sites in government contracts. In particular, Differing Site Conditions clauses require that contractors provide written notice to contracting officers of such discrepancies.

Pursuant to the Contract, Plaintiff excavated the space intended for use as the new cofferdam, and installed and operated a dewatering system meeting the minimum required system guidelines in the Contract. However, Kiewit was unable to lower the groundwater within the work area to within five feet of the bottom of the work area; the dewatering system only lowered the groundwater to an elevation within 13.5 feet of the excavation's floor. Kiewit informed the Corps of the situation in a letter dated June 6, 1994. In the letter, Kiewit alleged that the predrainage well system used to lower groundwater in the work area had not met the performance criteria set by the contract.

Kiewit wrote a second letter to the Corps on April 7, 1995. In the second letter, Kiewit requested $685,884.00 due to the unexpected water encountered at the work site. Kiewit maintained in the second letter that the extra groundwater added to Kiewit's construction expenses by necessitating the excavation of seven feet more of water-saturated soil from the work site than the Contract had indicated that Phase IIA would require. On September 21, 1995, Kiewit submitted a Type I differing site conditions claim under the contract's Differing Site Conditions clause to the Corps' Phase IIA contracting officer (the "Contracting Officer"), requesting compensation in the amount of $745,281.00 for unexpected costs accrued in Kiewit's performance of the Contract.[8] The claim alleged that the

---

7. Section 36.502 of the Federal Acquisition Regulation requires contracting officers to insert a Differing Site Conditions clause into all fixed-price construction contracts exceeding a "simplified acquisition threshold" of $100,000. The Contract is a fixed-price construction contract exceeding the simplified acquisition threshold of $100,000, and therefore required the inclusion of a Differing Site Conditions clause. Section I, Paragraph I.73 of the Contract, the Contract's Differing Site Conditions clause, thereby states that

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contacting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

Contract, § I, ¶ I.73.

8. There are two types of differing site conditions claims that serve as the predicate for recovery under the Differing Site Conditions clause of a

additional groundwater at the work site had caused the need for the excavation of an additional eight-and-a-half feet of water-saturated soil not identified by the Contract, amounting to a "differing site condition that impacted virtually all dewatering and excavation operations" in Phase IIA. Defendant's Motion For Summary Judgment On Count Two And Motion To Dismiss Count One For Lack Of Jurisdiction, Or In The Alternative, For Summary Judgment On Count One, App. ("App.") at 69 (Kiewit's certified claim). On March 21, 1996, Kiewit submitted a certification of its claim to the Corps. The Contracting Officer denied Kiewit's certified claim on April 7, 1998.

Plaintiff responded to the denial by filing a complaint in this Court on August 19, 1998. In the complaint, Kiewit seeks an equitable adjustment of $745,281.00 from the United States on the cost to perform the Contract plus interest on the adjustment accrued from the date that Kiewit's claim to the Corps was certified. In Count I of the complaint, Plaintiff makes a defective specifications claim because of alleged defects in the design specifications for the dewatering system. In the alternative, Kiewit alleges in Count II that the actual Phase IIA work site conditions differed from the work site conditions described by the Contract.

The government has moved to dismiss Count I for lack of subject matter jurisdiction, or in the alternative, for summary judgment on Count I. The government has also moved for summary judgment on Count II. The Court considers the case after oral argument and well reasoned briefs.

government contract. Type I differing site conditions claims require that the subsurface physical conditions at a work site differ materially from those indicated by a contract, and that these conditions are reasonably unforeseeable by the contractor making the claim. On the other hand, Type II differing site conditions claims consist of unknown and unusual physical conditions at a work site. The conditions must differ materially from those ordinarily encountered in the course of work required by the contract. *See J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 50–51 (1983) (internal citations omitted). Here, several facts in the record support the conclusion that the certified claim that Kiewit submitted to the Contracting Officer was a Type I differing site conditions claim. First, throughout its brief,

## DISCUSSION

### I. STANDARD OF REVIEW

The Unites States moves for dismissal of Plaintiff's claim on two bases: RCFC 12(b)(1), lack of subject matter jurisdiction, and RCFC 56(c), summary judgment where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 12(b)(1) authorizes the dismissal of a claim if, assuming the truth of all allegations, jurisdiction over the subject matter of the claim is lacking. When ruling upon a motion to dismiss for lack of jurisdiction, all facts must be assumed as true and construed in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Allen v. United States*, 46 Fed.Cl. 677, 680 (2000). When a party raises a jurisdictional question in a dispositive motion, it is the plaintiff who bears the burden of establishing the court's jurisdiction. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998); *Allen*, 46 Fed.Cl. at 680.

RCFC 56(c) provides for summary judgment if it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has defined a genuine issue over a "material fact" as a dispute "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

Plaintiff treats and discusses the certified claim as a Type I differing site conditions claim. *See, e.g.*, Plaintiff's Opposition To Defendant's Motion For Summary Judgment And Dismissal at 3. Second, Plaintiff impliedly concedes that it submitted a differing site conditions claim, as opposed to a defective specifications claim, to the Contracting Officer. App. at 61 (Plaintiff's Answers To Defendant's First Request For Admission). Third, the claim's title, "Excess Water Differing Site Condition," clearly announces the certified claim's basis. App. at 67 (Kiewit's certified claim). Lastly, the certified claim concludes that site conditions caused the unforeseen work expenses that gave rise to the certified claim. App. at 75, 78 (Kiewit's certified claim).

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. 2505. The moving party bears the initial burden of proof, but this burden may be discharged if an absence of evidence supporting the opposing party's claim is demonstrated. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing summary judgment carries the burden of showing a genuine issue of material fact in dispute. *See id.* at 324, 106 S.Ct. 2548.

## II. ANALYSIS

### A. Count I: Defective Specifications

The government moves to dismiss Count I of Kiewit's claim for lack of subject matter jurisdiction on the grounds that Kiewit failed to present a certified claim to the Contracting Officer alleging that defective specifications in the Contract led to the unexpected costs in Kiewit's performance of Phase IIA. The United States, as sovereign, is immune from suit unless Congress specifically waives this immunity. *See United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957). Congress has waived the United States' sovereign immunity under certain circumstances through the Tucker Act, which grants this Court jurisdiction over monetary claims against the United States. *See* 28 U.S.C. § 1491 (2002). The Tucker Act "does not create any substantive right enforceable against the United States for money damages ... The Act merely confers jurisdiction in the event that a substantive right to sue the government already exists." *Berry v. United States,* 27 Fed.Cl. 96, 100 (1992) (citing *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)).

Section 609 of the CDA provides contractors with a substantive right to bring an action in the United States Court of Federal Claims "in lieu of appealing the decision of the contracting officer." 41 U.S.C. § 609(a)(1) (2002). The CDA "applies to any express or implied contract ... entered into by an executive agency for ... the procurement of construction, alteration, repair or maintenance of real property." 41 U.S.C. § 602(a) (2002). However, the CDA waives the United States' immunity and gives the Court jurisdiction over a claim only where the plaintiff has first submitted the disputed claim in writing for a decision to the government contracting officer responsible for the contract at issue. 41 U.S.C. § 605(a) (2002); *James M. Ellett Construction Co. v. United States,* 93 F.3d 1537, 1541–42 (Fed.Cir.1996); *Advanced Materials, Inc. v. United States,* 46 Fed.Cl. 697, 699 (2000); *SMS Data Products Group, Inc. v. United States,* 19 Cl.Ct. 612, 614–15 (1990). The submitted claim must be "clear and unequivocal," *Reliance Ins. Co. v. United States,* 931 F.2d 863, 866 (Fed.Cir.1991), and it must provide the contracting officer with "adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987). If the plaintiff is unable to demonstrate that it has satisfied these requirements, then the court must dismiss the claim for lack of subject matter jurisdiction. *See Reliance Ins. Co.,* 931 F.2d at 866; *Thoen v. United States,* 765 F.2d 1110, 1116 (Fed.Cir.1985).

It is well-settled that Kiewit's certified claim was a Type I differing site conditions claim. However, Plaintiff argues that this Court may exercise jurisdiction over Count I, despite the fact that Kiewit never submitted a defective specifications claim to the Contracting Officer. Kiewit states that we have jurisdiction over a CDA complaint that is "based on the same set of operative facts" underlying the certified claim that was first presented to the contracting officer in a case. *Cerberonics, Inc. v. United States,* 13 Cl.Ct. 415, 417 (1987). Kiewit alleges that both the differing site conditions claim in the certified claim and the defective specifications claim in Count I depend upon like operative facts: the specifications and design of the dewatering system in the Contract.

Plaintiff is in error. Governing case law mandates that differing site condition claims and defective specification claims depend

upon varying sets of operative facts. Operative facts are the essential facts that give rise to a cause of action. *See Cerberonics, Inc.,* 13 Cl.Ct. at 417. The operative facts supporting a Type I differing site conditions claim filed pursuant to a standard Differing Site Conditions clause include (1) whether conditions indicated in the contract at issue differed materially from conditions encountered by the contractor during performance of the contract; (2) whether conditions actually encountered by the contractor were reasonably unforeseeable based upon all information available to the contractor during the contract bidding; and (3) whether the contractor reasonably relied upon its interpretation of the contract, and was thus damaged from the material variation between expected and encountered conditions. *HB Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed. Cir.1998). Thus, the operative facts necessary to maintain a differing site conditions claim in the instant case would focus on the Contract's description of the work site, particularly with respect to subsurface conditions, and Kiewit's reliance on that description.

▪ On the other hand, a defective specifications claim under the CDA requires showing that a contractor was misled by design specification errors presented within a government contract. *Robins Maintenance, Inc. v. United States,* 265 F.3d 1254, 1257 (Fed.Cir.2001). A defective specifications claim therefore focuses on the viability of design requirements that a contractor is required to implement in a government contract. The operative facts for a defective specifications claim in the instant case would concern the functioning of the Contract's dewatering system specifications. Thus, the Type I differing site conditions claim submitted to the Contracting Officer and the defective specifications claim made in Count I rely upon different operative facts.

▪ Kiewit also offers three provisions in the Contracting Officer's decision rejecting the certified claim as proof that the Contracting Officer understood that Kiewit's facts and arguments involved a differing site condition claim as well as a defective specifications claim. *See* Plaintiff's Opposition To Defen-

dant's Motion For Summary Judgment And Dismissal ("Plaintiff's Opposition") at 16. Kiewit's offer of proof implies that the certified claim provided "clear and unequivocal" notice to the Contracting Officer of both claims, and that said notice demonstrates the commonality of the operative facts at stake in either theory of recovery. *Reliance Ins. Co.,* 931 F.2d at 866; *see Contract Cleaning Maintenance, Inc.,* 811 F.2d at 592. However, the three provisions quoted by Kiewit fail to prove that the Contracting Officer understood that Kiewit intended to articulate anything other than a Type I differing site conditions claim.

The first provision acknowledges that the Contracting Officer received a letter from Kiewit after the submission of the certified claim. The letter informed the Contracting Officer that Kiewit intended to pursue multiple claims under "numerous" entitlement theories, "including a Type II differing site condition, mutual mistake, and defective design, 'just to name a few.'" App. at 145 (Contracting Officer's decision). However, this relatively vague statement of intent, on its own and without clarification, failed to give the Contracting Officer "adequate notice of the basis and amount" of these claims sufficient to fulfill the Court's jurisdictional prerequisites. *Contract Cleaning Maintenance, Inc.,* 811 F.2d at 586. Indeed, the Contracting Officer's ultimate decision addresses the only theory of recovery explicitly stated and fully supported in the certified claim, the differing site conditions allegation. *See* App. at 159–60 (Contracting Officer's decision). The decision mentions the Contract's dewatering system specifications only with respect to site condition assumptions, and does not mention the other bases of recovery alluded to in Kiewit's letter. *Id.*

The second provision merely repeats Kiewit's allegations regarding the root cause of the differing site conditions alleged in the certified claim, and the sources of site condition data in the Contract. *See* App. at 112 (Contracting Officer's decision). Nothing in the Contracting Officer's quoted statement indicates that the Contracting Officer believed that Kiewit advanced more than one theory of recovery in the certified claim.

The third provision notes that the Contracting Officer understood the certified claim to allege that the differing site conditions that gave rise to the instant case "prevented the predrainage system from achieving its design goal." App. at 112 (Contracting Officer's decision). Kiewit implies that this understanding means that the Contracting Officer believed that the certified claim advanced both differing site conditions and defective specifications claims. However, the quote only emphasizes that the Contracting Officer recognized the certified claim to allege that unforeseen work site conditions generated expenses for Kiewit by preventing the otherwise effective pre-drainage system dictated by the Contract from functioning as planned. This recognition is distinctly different from Kiewit's present contention that the Contracting Officer knew from the certified claim that Plaintiff alleged that both unexpected site conditions and faulty dewatering system design specifications resulted in damages to Kiewit.

■ Thus, the Court lacks subject matter jurisdiction over Count I because Kiewit never submitted a defective specifications claim to the Contracting Officer, and because the operative facts supporting the certified claim do not also support a defective specifications claim. However, even if we possessed the requisite jurisdiction over Kiewit's defective specifications claim, Defendant would be entitled to summary judgment because the specifications at issue are performance, rather than design specifications. Liability for defective specifications in a government contract only attaches when a contractor has relied upon government design specifications, and not merely performance specifications. *Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 84 (1992).

■ Performance specifications dictate an ultimate result that a contractor must achieve, leaving the contractor with the discretion to determine the means to achieve that result. *Big Chief Drilling Co. v. United States*, 26 Cl.Ct. 1276, 1293 (1992). On the other hand, design specifications set forth in detail the materials that a contractor must use and the manner in which the contractor is to employ the materials under a particular government contract. *Id.* The contractor has virtually no discretion to deviate from these details, and must follow them like a "road map." *Id.* (quoting *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 689, 412 F.2d 1360 (1969)). The corollary to this relative lack of discretion is an implied warranty that following the contractual specifications will fulfill the contract at issue. *See Blake Construction Co., Inc. v. United States*, 987 F.2d 743, 745. Thus, the government is liable for the extra costs generated by a contractor attempting to perform a contract that includes defective design specifications. *See Aleutian Constructors v. United States*, 24 Cl.Ct. 372, 378 (1991).

Plaintiff contends that the Contract provisions for the dewatering system are design specifications. Kiewit notes that the Contract provided detailed instructions on construction and installation of the system, and that any additions or modifications required approval by the Contracting Officer. Thus, according to Kiewit, the Contract significantly limited Plaintiff's discretion.

Despite Plaintiff's argument, the Contract provisions concerning the dewatering system included aspects of both design and performance specifications. The Contract's minimum required dewatering system was a design specification because it provided mandatory detailed instructions and construction drawings in the building and operation of the minimum dewatering system to be incorporated into Phase IIA. *See* Contract, § 2C, ¶¶ 3.1–3.6. However, the overall Contract specifications pertaining to the design, construction, and implementation of the dewatering system were performance specifications because they provided Kiewit with ample discretion to augment the Contract's specifications. *See, e.g.,* Contract, § 2C, ¶ 5.7.

Plaintiff's argument requires the Court to ignore multiple provisions of the Contract that not only afforded Plaintiff the discretion to augment the minimum system, but actually encouraged Kiewit to do so. In fact, at least eight Contract provisions granted Kiewit the discretion to supplement the minimum

prescribed dewatering system.[9] Furthermore, the Contract explicitly warned Kiewit that the minimum prescribed system was *not* warranted to satisfactorily dewater the work site, and that it was Kiewit's responsibility to augment the minimum prescribed system if necessary to control water seepage in accordance with guidelines provided by the Contract.[10]

The mere fact that the Contract required Plaintiff to satisfy the requirements of a minimum system is not a sufficient basis upon which to conclude that the Contract's overall dewatering provisions were design specifications. Contract provisions are not considered design specifications merely because a contractor is required to comply with certain aspects of a design. *See* John Cibinic, Jr. and Ralph C. Nash, Jr., *Administration of Government Contracts* 282 (3d ed.1995) (stating that "[t]he fact that the Government specifies a minimum requirement for some detail of performance does not transform a performance specification into a design specification"). Thus, the relevant Contract provisions are best viewed as performance specifications.

The only defective specifications theory under which Plaintiff could recover is one in which the requirement to include the minimum prescribed system constituted the source of the instant complaint. However, Count I does not allege such a theory of recovery. Rather, Plaintiff argues that we should find Defendant liable for the minimum system's failure to produce the water level in the work site required under the Contract. The alleged failure, however, of this minimum system to achieve the overall goals of the Contract does not give rise to a claim for defective specifications because the system was never warranted to achieve such results. As noted above, the Contract expressly informed Plaintiff that the Corps did not guarantee the adequacy of the minimum system to achieve the work site conditions required under the Contract. *See* Contract, § 2C, ¶ 3.4. Thus, even if we did not dismiss Count I for the previous reasons, we would grant Defendant summary judgment with respect to Count I because the Contract provisions at issue are performance, rather than design specifications, and because liability for defective specifications *only* attaches when a contractor has relied upon government design specifications. *See Sterling Millwrights, Inc.*, 26 Cl.Ct. at 84.

## B. Differing Site Condition

■ In Count II of the instant claim, Plaintiff asks for an equitable adjustment arising from Type I differing site conditions

---

9. *See* Contract, § 2C, ¶ 3.4 (stating that "[i]f any additional facilities are required for control of ground or surface water, or if any monitoring systems are required in addition to those specified for the minimum required system, the Contractor shall include such additional features in his Groundwater Control Plan"); Contract, § 2C, ¶ 6.2 (requiring Kiewit to acknowledge that "his design includes the minimum required features of the groundwater control facilities set forth in these specifications and sufficient supplementary installations as may be required to control groundwater and surface water as specified"); Contract, § 2C, ¶ 6.2.1 (authorizing supplementary measures, including additional wells and pumps, and "[c]ontrol of all surface, perched water, etc. encountered, that is not specifically planned for by installation of the minimum required system"); Contract, § 2C, ¶ 8.2.1 (authorizing supplemental wells);Contract, § 2C, ¶ 8.1.1(2) (allowing Kiewit to control groundwater level by pumping from 50 predrainage wells specified in the minimum system "and any other wells or wellpoints considered or found to be necessary, and by sump pumping as required"); Contract, § 2C, ¶ 8.1.2 (authorizing Kiewit to include "additional features and facilities" in its groundwater control plan) Contract, § 2C, ¶ 8.1.4(6) (making Kiewit responsible for "[d]esigning any features of the predrainage well and ground and surface control systems not specifically covered by these specifications or drawings"); Contract, § 2C, ¶ 9.1 (granting Kiewit the discretion to "design, install, operate, and maintain dikes, ditches, sumps, pumps, and discharge piping for controlling surface water so as to prevent flooding of the work area for excavation as required").

10. The Contract states that "[i]t is not intended nor is it warranted or implied that the minimum required facilities as specified and shown on the applicable drawings will remove or control all groundwater or surface water nor is it guaranteed that the existing cofferdam cells will be watertight. It is the Contractor's responsibility to control all ground and surface water as specified herein even though ... the Contractor's groundwater control facilities may be more than those specified for the minimum required facilities." Contract, § 2C, ¶ 3.4.

at the work site. Plaintiff alleges that the Contract's dewatering system specifications represented five conditions that differed from actual work site conditions, resulting in excess, unforeseeable costs to Plaintiff. Kiewit claims that the five conditions falsely indicated that (1) the bedrock at the site was tight, preventing excess water seepage; (2) the bottom of the cofferdam cells and the downstream guide wall and landslide dock wall would form a tight contact with the bedrock, preventing excess water seepage; (3) the sheet pile cutoff walls and the slurry trench cutoff wall would prevent any significant seepage into the work area; (4) the groundwater level in the sands and gravel to be excavated could be lowered to within five feet of the top of the rock, or bottom of the excavation, using the specified minimum pre-drainage system; and (5) the excavation would be performed "in the dry."

To establish entitlement to an equitable adjustment based upon a Type I differing site condition, Kiewit must demonstrate by a preponderance of the evidence that (1) the Contract affirmatively represented the subsurface conditions of the work site that form the basis of the instant claim; (2) Plaintiff acted as a reasonably prudent contractor in interpreting the Contract; (3) Plaintiff reasonably relied upon the Contract's indications of subsurface conditions; (4) the subsurface conditions actually encountered at the work site differed materially from the subsurface conditions of the work site indicated in the Contract; (5) the subsurface conditions actually encountered were unforeseeable; and (6) Plaintiff's claimed excess costs are solely attributable to the materially different subsurface conditions at the work site. *See Weeks Dredging & Contracting, Inc. v. United States,* 13 Cl.Ct. 193, 218 (1987), *aff'd,* 861 F.2d 728 (Fed.Cir.1988). Plaintiff is not entitled to recovery under Count II because the Contract does not contain representations regarding subsurface conditions. If the Contract gives no indications of the subsurface conditions at the work site, then the risk for all unknown or unanticipated subsurface conditions remains with Kiewit, and we must grant summary judgment in favor of Defendant on Count II. *See Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 95 (1989) (concluding that Type I differing site conditions do not exist when a contract does not make representations regarding work site conditions).

Plaintiff has erroneously identified Contract provisions as representations of subsurface conditions. In actuality, these provisions merely list baseline assumptions incorporated into the design of the minimum prescribed dewatering system, inform Kiewit how to operate the dewatering system, and address work to be done by other contractors in subsequent phases of the Winfield Locks and Dam construction project. Specifically, the Contract provisions referring to bedrock, cofferdam cells, and downstream guide and landslide lock wall, cited by Plaintiff serve as bases for the minimum dewatering system required by the Contract. *See* Contract, § 2C, ¶ 5.7, Contract. The provisions informed bidders that the design of the minimum required dewatering system incorporated several fundamental assumptions regarding the ability of the minimum system to prevent water seepage. For example, the provisions note that assuming that the bedrock at the work site is tight, the minimum dewatering system should prevent the seepage of water into the work site. *See id.* These provisions therefore put contractors on notice that the contractors might have to augment the minimum system to fulfill the Contract if conditions at the site differed from the assumptions undergirding the minimum prescribed dewatering system.

The disclaimers that appear alongside the provisions in § 2C, ¶ 5.7, of the Contract further emphasize the fact that the Contract made it clear that Kiewit was expected to augment the minimum dewatering system as necessary. For example, the portions of the Contract in Section 2C, Paragraph 5.7 relied upon by Plaintiff contain the following express warnings: *"These assumptions may or may not be completely valid."* Section 2C, Paragraph 5.7, Contract (emphasis in original). Similar disclaimers regarding the minimum dewatering system appear throughout the Contract. The provisions referenced by Plaintiff therefore expressly warn contrac-

tors to determine for themselves the necessity of supplementing the minimum required dewatering system to achieve desired work site conditions, making Plaintiff ultimately responsible for the construction and performance of the dewatering system. Consequently, the Differing Site Conditions clause cannot, as a matter of law, apply to these provisions, because the provisions do not refer to existent physical conditions at the work site. *See Fru–Con Construction Corp. v. United States,* 43 Fed.Cl. 306, 317 (1999) (holding that the applicability of Differing Site Conditions clauses is "strictly limited to those physical conditions present at the time of contracting").

Furthermore, the other portions of the Contract cited by Plaintiff as representations of site conditions, Paragraphs 1, 8.1. 8.1.1, and 8.1.4(2) of Section C, instead served to inform Kiewit of contractual terms that the contractor was required to fulfill. The provisions tell the contractor to use the dewatering system required by the Contract to *achieve* specific work area conditions, rather than telling the contractor to *expect* particular site conditions prior to completing Phase IIA. For example, Paragraph 1 states that "[Phase IIA] includes, initial dewatering of the area to be excavated and controlling any incidental seepage through or beneath the cofferdam cells or the slurry trench cutoff wall, and predraining the alluvial sands and area within the cofferdam area." Contract, § 2C, ¶ 1. Contrary to Plaintiff's claim that "[t]he specifications lead the contractor to believe that there will not be any significant seepage into ... [the] work area," Paragraph 1 merely notes the scope of the work that a contractor must accomplish in Phase IIA. Plaintiff's Opposition at 6. Similarly, Paragraphs 8.1, 8.1.1, and 8.1.4(2), tell the contractor to lower the groundwater within the excavation area to within five feet of the excavation's bottom by operating the dewatering system, as necessary. *See* Contract, § 2C, ¶¶ 8.1, 8.1.1, 8.1.4(2). Thus, none of these provisions guarantee the existence of particular work site conditions.

Plaintiff further cites the provisions in Paragraphs 1, 8.1, 8.1.1, and 8.1.4(2) to argue that the Contract indicates that excavation in Phase IIA should be performed in the dry. Plaintiff's Opposition at 7–8. However, these provisions actually refer to work to be performed after the completion of Phase IIA, and therefore do not apply to Kiewit. The Court gives a contract the same meaning that a "reasonably intelligent person acquainted with the contemporaneous circumstances" of a contract's formation would give the contract. *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). The Contract governed the performance of the second phase, Phase IIA, of a multi-phase project to expand the Winfield Locks and Dam on the Kanawha River in West Virginia. Phase IIA required Plaintiff to dewater and excavate the designated work site to facilitate subsequent construction in the excavation area.[11] Once Kiewit fulfilled the Contract, the Corps would employ somebody else to fulfill the next phase of the project. *See* Section 2C, Paragraph 3.1, Contract. Examining the provisions thus reveals that the references to "work in the dry" cited by Plaintiff denote a subsequent phase of the Winfield Locks and Dam project, rather than the excavation work Kiewit undertook under Phase IIA.

For example, Paragraph 1 stated that Kiewit was "to dewater the excavation and control surface area within the excavation so that *other work* can be performed in the dry." Contract, § 2C, ¶ 1 (emphasis added). The Contract thus mandated that Kiewit dewater the work site in Phase IIA so that other contractors could perform "other work" in dry conditions during subsequent phases of construction. More explicit references to this "other work" throughout the Contract corroborate our interpretation of Paragraph 1. Paragraph 8 made multiple statements that indicated that it was the construction of the lock and dam after the completion of Phase IIA that the Corps expected to be performed under dry conditions. Paragraph

11. Specifically, the Contract required Kiewit to design, furnish, install, test, pump, and maintain "a groundwater control system consisting of sheet pile cutoff walls ... slurry trench cutoff

walls ... piezometers, predrainage wells, ditching and/or sandbagging, and sump pumping, to dewater the excavation and control surface water within the excavation." Contract, § 2C, ¶ 1.

8.1 stated that Kiewit must control seepage "so that construction of the lock and gate bay can be accomplished within the excavation in the dry." Contract, § 2C, ¶ 8.1. Similarly, Paragraph 8.1.1 indicated that Kiewit must control seepage into the excavation "so that permanent work can be constructed in the dry without interruption." Contract, § 2C, ¶ 8.1.1. Here, "permanent work" referred to the construction of the lock and gate bay that were the objectives of the Contract, since Phase IIA merely concerned preparatory work designed to facilitate the ultimate construction at issue in the project. *See* Contract § 2C, ¶ 1. However, even if none of these provisions referred to work subsequent to Phase IIA, they were still indications of what the Corps intended Phase IIA to accomplish, rather than guaranteed site conditions. Thus, Plaintiff cannot properly claim that any of these references to work being performed in dry conditions were indications of existent subsurface conditions at the work site.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion to Dismiss Count I, and GRANTS Defendant's Motion for Summary Judgment on Counts I and II. The instant case is hereby DISMISSED. The Clerk of the Court is directed to enter judgment DISMISSING the complaint.

IT IS SO ORDERED.