**ALL POWER, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 03–564C.

United States Court of Federal Claims.

May 25, 2004.

Cl. at 664, 2004 WL 1161880 at *27.

Robert E. Thurbon and Erin E. Mackey, Thurbon & McHaney, LP, Gold River, California, for Plaintiff.

J. Reid Prouty, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

## ORDER AND OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WILLIAMS, Judge.

In this action under the Contract Disputes Act, Plaintiff seeks an equitable adjustment to its contract to repair a fuel storage tank. Specifically, Plaintiff contends it encountered two differing site conditions: (1) large quantities of a free-flowing compound consisting of jet fuel and oil (free product) in the tank and (2) high lead content in the paint on the tank, requiring lead abatement.[1] This matter comes before the Court on Defendant's Motion for Summary Judgment.[2] Because there are genuine issues of material fact, this action cannot be resolved on summary judgment. Accordingly, Defendant's motion is denied.

---

1. With regard to lead abatement, Plaintiff argues in the alternative that abatement work was beyond the scope of the contract and constituted a change.

2. Defendant filed its motion on April 14, 2004, Plaintiff filed its opposition on May 4, and Defendant filed its reply on May 7. The Court deemed oral argument unnecessary.

### Background [3]

In response to solicitation number DACA05–00–R–0045, Plaintiff was awarded contract number DACA05–00–C–0024 on September 28, 2000. Pl's App. at 5. A Notice to Proceed was issued on November 5. Pl.'s App. at 15, 17.

The solicitation originally contemplated work on three fuel storage tanks—Tanks 10, 11 and 14, for "all work needed for the repair or replacement of domes, skylights, and seals on tanks 10 and 11, and replacement of tank 14 bottom and seal at the Bulk Fuel Storage Facility." Pl.'s App. at 1. However, as awarded, the contract only included work on Tank 14. Pl.'s App. at 2, 15.

### Free Product

The contract described Tank 14 as a cylindrical storage tank 40 feet high with a diameter of 42.5 feet used by the Air Force for storing jet fuel. Pl.'s App. at 19. Section 01010, Summary of the Work, provided that "[t]he general scope and character of the work is indicated on the drawings." Pl.'s App. at 24. Drawing C2, General Notes, No. 16 stated: "Tank 14 has been drained, cleaned and vapor freed. Tanks 10 and 11 contain JP–8 fuel." Pl.'s App. 19. Drawing M2 depicted Tank 14 as having two bottoms—an "original bottom" that sits on the ground and a "current bottom" or second bottom that rests on a layer of sand sandwiched between the current and original bottoms. Pl.'s App. at 20. The contract directed Plaintiff to remove and replace the current bottom as well as the sand between the bottoms. Pl.'s App. at 20, 28.

The contract indicated that the sand was contaminated with jet fuel and oil. Section 01351, part 3.7.1.1 stated: "[t]he sand and

soil bottom is anticipated to contain fuels from past and/or present fuels." Def.'s App. at 4. Section 02100, part 3.03(B) provided that the "[s]and shall be considered contaminated with oil" and Drawing M2, Detail 1, provided that "existing sand is contaminated with oil and jet fuel." [4] Pl.'s App. at 20, 28.

Prior to doing any work, Plaintiff was required to drill a hole in the current bottom to test the Lower Explosive Limit (LEL) and oxygen content of the area underneath that bottom.[5] Barnes Depo. at 23–24, Def.'s App. at 19–20; Section 02100, part 2.09, Pl.'s App. at 27. An LEL lower than 10% permitted hotwork, while any level above that required a nitrogen purge to reduce explosive levels to within acceptable limits before hotwork could be performed.[6] Pl.'s App. at 27.

Plaintiff cut an 8'x8' hole or door sheet into the side of Tank 14 to enter the tank and planned to cut out the bottom using a cutting torch (hotwork). Barnes Depo. at 18–19, 23–24, Def.'s App. at 17–20. When Plaintiff drilled a test hole, free product "came spurting up" from the hole to a height of "about 18 inches" and continued spurting at that level for a couple of days. Barnes Depo. at 31, Def.'s App. at 23. The space beneath the current bottom was so full of free product that it was not possible to use the nitrogen purging procedure. As Plaintiff's site superintendent testified:

Q. And why couldn't you do what you originally had planned? I can understand if there was sort of standing liquid on top, but I need you to explain to me if you could no longer do what you planned to do?

A. Specs called for us if there were LELs, to drill a series of holes in the

---

**3.** The background is derived from the Complaint, excerpts from the contract drawings, deposition testimony and other materials filed in connection with Defendant's Motion for Summary Judgment and Plaintiff's opposition. Plaintiff's Appendix ("Pl.'s App.") refers to the appendix to Plaintiff's Separate Proposed Findings of Uncontroverted Fact. Defendant's Appendix ("Def.'s App.") refers to the appendix to Defendant's Proposed Findings of Uncontroverted Facts.

**4.** In response to Defendant's Interrogatory Number 3, Plaintiff also identified section 01351, part 3.04 as misrepresenting the condition of the sand

in Tank 14. Part 3.04 addressed "Fuel Removal" and stated that "[a]ll possible recoverable fuel will be pumped or otherwise removed from the tank by the Government." Pl.'s App. at 21.

**5.** The parties dispute whether Plaintiff received permission from the Air Force to drill this hole.

**6.** A nitrogen purge entails injecting nitrogen gas into the affected area to reduce the LEL content. Nitrogen gas is continuously injected during the performance of any hot work. Barnes Depo. at 38, Def.'s App. at 27.

tank bottoms and inject it with nitrogen, use the nitrogen purge. You can't purge a space that's full of product because there's no place for the purging to go. So you have to use a different procedure completely.

Q. And what different procedure would that have been?

A. You have to flow—you drill the series of holes like this—instead of using nitrogen, you drill bigger holes, and you put taps in there and pump water, Because you need to dilute it down to where your LELs are no longer combustible so you can pump the water out.

Q. When you pump the water in, you also have to pump it out?

A. Yes.

Q. So to make sure I understand this right, the difference with the sort of free product in there is that—a gaseous way of inserting it wouldn't work because there would be no space?

A. Correct.

Barnes Depo. at 37–38, Def.'s App. at 26–27.

Plaintiff hired a subcontractor, Foss Environmental Services (Foss), to remove the free product from between the tank bottoms and haul away the contaminated sand. Complaint ¶ 13; Answer ¶ 13.

*Lead*

Plaintiff also alleges a differing site condition based upon its discovery that the interior and exterior of Tank 14 was painted with lead-based paint, requiring lead abatement. Complaint ¶¶ 22, 40.

Section 01351, part 3.7 provided in pertinent part:

3.7 Site Description And Contamination Characterization

3.7.1 Project/Site Conditions

The following information is a record of site contaminants and a description of the site. This information is provided to assist in preparing the SSHP [Site Safety Health Plan]. Additional sources of information are available as listed below.

3.7.1.1 Site Information

The tanks for this project currently or most recently have contained JP–8 jet fuel. It has been estimated to be greater than 20 years since the last major repair on these tanks has occurred. As a result, the past contents of these tanks may be present, which may include organic lead and other additives.

. . . .

The previous coatings on the tanks may have contained lead, cadmium, chromium, mercury, other metals, and potentially polychlorinated biphenyls (PCBs). New coatings are specified as containing organo-tin compounds, isocyanates, fluorinated polyurethane (PTFE), Methyl amyl ketone (MAK), and zinc (zinc base may contain small amounts of lead as a contaminant). In addition, mastics, seals, and gaskets may contain asbestos.

Def.'s App. at 3–4.

Paragraph 3.8.1 Site Tasks and Operations (Workplan) provided in pertinent part:

3.8.1 Site Tasks and Operations (Workplan)

The SSHP shall include a comprehensive section that addresses the tasks and objectives of the site operations and the logistics and resources required to reach those tasks and objectives. Based on the type of work required, the following is a list of anticipated major site tasks and operations to be performed:

Stating of equipment and materials

On-site training

Safety Brief

Empty Tank

Isolation and Lockout/tagout of energy sources

Inerting of tank (Vapor/gas freeing)

Atmospheric Testing of Tank

Cutting of tank entry—COLD WORK ONLY

(as least two locations for ventilation)

Ventilation of tanks

Tank Entry

Cleaning of tanks

Abrasive blasting

Sludge removal

Interior/exterior coating removal

Removal sand/soil on tank bottom

Hot work

Removal/repair of tank bottom

Replace tank coatings

Field testing of repair

Replace/repair tank entry locations

Transfer of fuel from one tank to another

Waste collection and storage

This is not a complete list of site tasks and operations; therefore, it shall be expanded and/or revised, during preparation of the SSHP as necessary.

Def.'s App. at 4–5.

Paragraph 3.8.2.2 entitled Chemical Hazards identified potential hazards to which employees might be exposed and stated "new coatings ... zinc (zinc base may contain small amounts of lead as a contaminant)." *Id.* at 5.

Section 01351, Part 3.05 of the contract, "Tank Cleaning," included subsection C, "Lead Hazard Personnel Safety," which stated: "Due to the lead hazard associated ... with this tank, comply with API [American Petroleum Institute] Publ.2015, and the applicable rules and regulations of the State of California ... and Federal Occupational Safety and Health Standards." Pl.'s App. at 23. API's Publication 2015, "Safe Entry and Cleaning of Petroleum Storage Tanks" included Subsection 7.4.4, "Inorganic Lead," which provided:

Inorganic lead may be present in paints and coatings used on tanks and piping .... Exposure to inorganic lead can occur during cleaning operations including, but not limited to, sludge, deposit and residue removal, grinding, blast cleaning and scraping.

Def.'s App. at 33–34.

Prior to doing any hotwork on the tank, Plaintiff discovered during the course of performing the work that the interior and exterior of Tank 14 was painted with lead-based paint. During a site visit on June 12, 2001, Plaintiff's site superintendent reported that "a test of the exterior paint on the tank shell indicated that it contained enough lead to trigger the OSHA standards for removal." Pl.'s App. at 32. On June 14, 2001, laboratory results from paint chips taken on the inside of the tank showed that it also contained enough lead to trigger the OSHA standard for removal. *Id.* at 34. On June 20, 2001, the Government directed All Power to proceed with removing the lead-based paint from the interior and exterior of the tank. *Id.* at 36. On June 26, 2001, Plaintiff brought a lead paint abatement contractor on site to examine the areas to be abated. *Id.* at 38.

The Corps' estimate of reasonable costs for the project did not include lead abatement as a component of the work to be done under this contract. Since Plaintiff was not licensed to perform lead abatement, Plaintiff hired Consolidated Western Contractors as a subcontractor for that purpose. Complaint ¶ 18. Plaintiff was not required to abate the lead paint on the entire tank, only in those areas in which cutting was to be done. *Id.* at 81–82.

### *Discussion*
### *Summary Judgment Standard*

The Court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit." *Id.* at 248, 106 S.Ct. 2505. The movant has the burden of establishing the absence of genuine issues of material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505. It is not necessary that such evidence be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Celotex,* 477 U.S.

at 324, 106 S.Ct. 2548; *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed.Cir.1987). A court does not "weigh" each side's evidence when considering a motion for summary judgment. *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed.Cir.2002). Rather, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### Type I Differing Site Condition—Free Product [7]

■ In order to prevail on a claim for a Type I differing site condition, the contractor must prove by a preponderance of the evidence that:

> [T]he conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions.

*Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed.Cir.2002) (citing *H.B. Mac. Inc. v. United States*, 153 F.3d 1338, 1345 (Fed.Cir.1998)).

A contractor cannot prevail on a claim for a Type I differing site condition "unless the contract indicated what that condition would be." *H.B. Mac*, 153 F.3d at 1345. *See also Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 858 (1987) (a type I claim "stands or falls upon what is indicated in the contract documents"). However, the "indication" in

the contract "need not be explicit or specific" if it "provide[s] sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir. 1984) (citation omitted). "There must be reasonably plain or positive indications in the bid information or contract documents that such subsurface conditions would be otherwise than actually found in contract performance ...." *Pacific Alaska Contractors, Inc. v. United States*, 193 Ct.Cl. 850, 436 F.2d 461, 469 (1971); *Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 350 (1987) ("The representations in the contract may be either expressly stated or implicit in the contract specifications."). Determining what the contract indicated requires contract interpretation performed by stepping into "the shoes of a reasonable and prudent contractor and decid[ing] how such a contractor would act in interpreting the contract documents." *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1274 (Fed.Cir.2001)(quotations omitted) (citation omitted).

The contract provided the following regarding the presence of fuel in Tank 14:

— "[t]he sand and soil bottom is anticipated to contain fuels from past and/or present fuels" (Section 01351, part 3.7.1.1),

— the "[s]and shall be considered contaminated with oil" (Section 2100, part 3.03(B)), and

— the "existing sand is contaminated with oil and jet fuel" (Drawing Number M2, Detail 1).

■ Defendant contends that these sections did not represent that the area between the tank bottoms was liquid free and alerted Plaintiff to possible free product beneath the current bottom. Plaintiff argues that it is the extent of free product encountered along

---

7. The contract incorporated the Federal Acquisition Regulation's (FAR), Differing Site Conditions clause 52.236–2:

> The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which

differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

48 C.F.R. § 52.236–2(a).

with the sand which constituted a differing site condition. Drawing all inferences in Plaintiff's favor, these provisions could be construed to indicate that Tank 14 contained sand tainted with jet fuel, not filled with such a large volume of free-flowing product that it would spurt to a height of 18″ for days. Further, Drawing Number M2 depicted a layer of sand between the current and original bottoms, but did not show volumes of liquid, which would support the plausibility of Plaintiff's construction of the contract. Because there are genuine issues of material fact regarding what the contract represented regarding the presence and extent of free product in Tank 14 and what a reasonable interpretation of those provisions would be, the Court cannot grant Defendant's motion for summary judgment on this claim.

### Plaintiff's Type II Differing Site Condition Claim—Free Product

 Alternatively, Plaintiff contends that the amount of free product encountered constitutes a Type II differing site condition. A Type II differing site condition is an "unknown physical condition ... that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience, if any, as a contractor in the area." *Randa*, 239 F.3d at 1276 (quotations omitted) (citation omitted). A Type II differing site condition depends on the existence of three elements—(1) the condition must be unknown to the contractor; (2) unusual; and (3) materially different from comparable work. *Kiewit Const. Co. v. United States*, 56 Fed. Cl. 414, 417 n. 8 (citation omitted). Relative to Type I claims, plaintiffs have a greater burden demonstrating the existence of Type II conditions. *Randa*, 239 F.3d at 1277 (citing *Charles T. Parker Constr. Co. v. United States*, 193 Ct.Cl. 320, 433 F.2d 771, 778 (1970)) (proving a Type 2 differing site condition is more difficult than providing a Type 1 differing site condition, involving a heavier burden and a "stiffer test."); *Servidone Constr. Co. v. United States*, 19 Cl.Ct. 346, 360 (1990) ("Unlike in a Type I case, where the contract serves as the basis of comparison, in a Type II case, there is no clear written point of reference.").

██ Defendant argues that the condition of Tank 14 was not unusual, proffering the deposition testimony of Plaintiff's site superintendent, Mr. Barnes:

Q. [I]s it beyond the norm to have some sort of liquid or free liquid between two tank bottoms?

A. It is usually indicated if that situation exists.

Q. All right. But that situation does exist on occasion, correct?

A. That is correct.

Q. In your experience, how common is it?

. . . .

A. It is common enough, yes, but not always.

Barnes Depo. at 61, Def.'s App. at 30.

Defendant also cites API Publication 2207, discussing industry protocol for hotwork on fuel tanks and advising contractors that "it may be desirable to displace the flammable liquids beneath the tank by water flooding." Def.'s App. at 14. Defendant also cites the contract provisions stating that sand in Tank 14 is contaminated with jet fuel.

On this record, Defendant has not established the absence of a genuine issue of material fact regarding whether the spurting free product was unusual and materially different than that encountered in comparable work.

Moreover, in opposing summary judgment, Plaintiff cites the deposition testimony of the Air Force's Project Manager, Duane Barker:

Q. Now, the tank was originally represented to be clean and vapor free ... [and] it should have been adequate to do hot work ...

A. The problem was that conditions [in Tank 14] were different than ... what [the contractor] had anticipated being present in the tank.

Q. How were those conditions different?

A. The quantity of—of materials that came up through the bottom of the tank. I don't know, there may have been as much as 300 gallons, but that's conjecture. I don't know the amounts, but I know there were large amounts

of fuel-water mix that came up and—and had to be removed . . . .

Barker Depo. at 32–33, Pl.'s App. at 55–56.

Even if Defendant had met its burden of establishing the absence of a genuine issue, Plaintiff's proffered evidence would suffice to raise a factual dispute as to whether the volume of free product was a differing site condition, precluding the entry of summary judgment.

### Plaintiff's Type I Differing Site Condition Claim—Lead

■ Defendant contends that because the contract did not affirmatively indicate that Tank 14 was free of lead-based paint and several provisions warned that the tank's coatings might contain lead, Plaintiff cannot establish a Type I differing site condition with respect to lead.

Plaintiff cites two issues of material fact regarding lead: 1) what the contract represented the condition of Tank 14 to be with regard to the level of lead-based paint on the interior and exterior of the tank, and 2) whether or not the contract required All Power to abate lead-based paint on the interior and exterior of the tank. Section 01351, part 3.7.1.1 provided that "previous coatings on the tanks may have contained lead . . . [and][n]ew coatings are specified as containing . . . zinc (zinc base may contain small amounts of lead as a contaminate)." Def.'s App. at 3–4. Plaintiff construed this provision to mean that older paint containing lead had been replaced with newer paint consisting in part of a zinc base containing only trace amounts of lead, which was therefore not lead-based. Construing all inferences in Plaintiff's favor as we must, Plaintiff's interpretation is plausible. Further, Plaintiff's interpretation that the absence of any provision in the contract setting out a requirement or protocol for lead abatement meant that lead abatement would not be necessary is also plausible and raises a genuine issue of material fact as to whether the contract is properly interpreted to require lead abatement.

8. This argument may be better suited to Plaintiff's alternative claim that the lead abatement performed on Tank 14 fell outside of the scope of

### Plaintiff's Type II Differing Site Condition Claim—Lead

■ Defendant contends that Plaintiff's Type II claim concerning lead abatement fails because numerous provisions in the contract put Plaintiff on notice of the presence of lead paint. Plaintiff counters that these provisions dealing with health and safety hazards and recommending that precautionary measures be taken, do not expressly require lead *abatement* as a component of contract performance. Again, a genuine issue of material fact arises insofar as Plaintiff contends that if lead abatement were part of the contract, it would normally have been spelled out.[8]

When asked if the Air Force considered lead abatement as part of the work that had to be done on Tank 14, the Air Force Project Manager, Mr. Barker responded:

Q. Was there work that All Power was required to perform on Tank 14 that in your view was out of scope?

A. Yes.

Q. If you would—to the best of your recollection, can you tell what that work was?

A. Well, it's my understanding that All Power was required to remove lead from the paint on the interior of the tank, which the government—the Air Force did not believe there was any lead on the inside of that tank, so I was unable to understand and still am how the government could construe that was included in the contract when we did not think there was any lead there, to the best of our knowledge of the tank history.

. . . .

Q. —the Air Force didn't consider that lead paint abatement was in All Power's scope of work.

 Is that your testimony?

A. Absolutely—that's my testimony, correct.

Barker Depo. 18, 23–24, Pl.'s App. at 46, 49–50. Moreover, the Corps' independent esti-

the contract. Either way, the record does not support entry of summary judgment for Defendant at this time.

mate for the project did not include lead abatement. These factors combine to raise genuine issues of material fact as to whether lead abatement work on Tank 14 was either a differing site condition or outside the scope of the contract.

### *Conclusion*

1. Defendant's motion for summary judgment is **DENIED**.

2. The pretrial conference will be conducted as scheduled via telephone on **June 1, 2004.** The Court will initiate the call, and a court reporter will transcribe the proceedings.

3. This action will proceed to trial as scheduled. Trial will be conducted on Wednesday through Friday, **June 23– 25, 2004,** at the United States District Court for the Eastern District of California (Sacramento), 501 I Street, Sacramento, California 95814, in Courtroom 9 on the 13th Floor. Trial will begin at 9:00 a.m. on each day, and conclude at 6:00 p.m. unless the Court orders otherwise. During each day of trial, the Court anticipates taking a 15– minute mid-morning recess, a one-hour luncheon recess and one 15–minute mid-afternoon recess. Subject to the availability of the courtroom, the Court is willing to sit early or late to accommodate the schedules of witnesses and counsel.