ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Selevive Group, LC | ) ASBCA Nos. 63292, 63293 |
| | ) |
| Under Contract No. W91QF4-21-P-0023 | ) |

APPEARANCES FOR THE APPELLANT:     Nicole D. Pottroff, Esq.
                                   Shane J. McCall, Esq.
                                   John L. Holtz, Esq.
                                   Stephanie L. Ellis, Esq.
                                   Greg P. Weber, Esq.
                                     Koprince McCall Pottroff LLC
                                     Lawrence, Kansas

APPEARANCES FOR THE GOVERNMENT:     Scott N. Flesch, Esq.
                                     Army Chief Trial Attorney
                                   MAJ Chris C. Walton, JA
                                   Dana J. Chase, Esq.
                                   CPT Camille J. Grathwohl, JA
                                     Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE EYESTER
PURSUANT TO BOARD RULE 12.2 ON
THE GOVERNMENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

Selevive Group, LC (Selevive or appellant) appeals two contracting officer final decisions (COFD) and has elected to proceed under the Board's Small Claims (Expedited) Procedures, Board Rule 12.2. The Contract Disputes Act, 41 U.S.C. § 7106(b)(4)-(5), as implemented by Board Rule 12.2, provides that this decision shall have no precedential value, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.

The government contends the Board lacks jurisdiction and has moved to dismiss the appeals. For the reasons stated below, we grant the government's motion in part and deny it in part.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On December 10, 2020, the Department of the Army, Mission and Installation Contracting Command, issued Solicitation No. W91QF421Q0010 for visual inspection and certified testing of lightning protection systems (LPS) at Fort Leavenworth (R4, tab 1 at 1, 6). The solicitation was set-aside for women-owned small businesses (*id.* at 1). Offerors were to submit quotations using fixed-prices for all contract line-item numbers (CLINs), which included the base year CLIN and two-option year CLINs, and award was to be made on a lowest-priced technically acceptable (LPTA) basis (*id.* at 26-27, 29). The solicitation had two technical exhibit (TE) attachments: Technical Exhibit A – Facilities Lists & Measurements, and Technical Exhibit B – Installation Map (*id.* at 26).

2. On April 27, 2021, the agency awarded purchase order No. W91QF421P0023 in the amount of $23,087.50 to Selevive for the base year (R4, tab 7 at 64). The purchase order included Federal Acquisition Regulation (FAR) 52.212-4, Contract Terms and Conditions – Commercial Items (OCT 2018), which requires resolution of a dispute pursuant to FAR 52.233-1, Disputes, and for the contractor to proceed with performance pending final resolution of the dispute. FAR 52.212-4(d).

3. Pursuant to the performance work statement (PWS), the appellant was to provide all supervision, labor, supplies, and equipment "necessary to perform visual inspections, and certified testing of [LPS] for facilities at Fort Leavenworth as defined in this [PWS] and the Technical Exhibits and Attachments" (R4, tab 7 at 70). The purchase order stated several times that the appellant shall "accomplish all inspection and testing tasks [in accordance with] the Unified Facilities Criteria [(UFC)] 3-575-01, [National Fire Protection Association (NFPA)] 780, [Department of the Army Pamphlet (DA Pam)]-385-64, UL Lighting Protection Standards and other listed regulatory standards" (*id.* at 78; *see also id.* at 70). In addition, the appellant was to ensure all work was accomplished in accordance with the documents in paragraph 7, which included the technical exhibits, and identified "which buildings/areas belong to each building type, the approximate square footage of the building/areas roofs, any special security considerations, and any constraints" (*id.* at 70, 90).

4. Further, the appellant was to provide the government "with a comprehensive report showing inspections, tests and results therein performed on all facilities" (R4, tab 7 at 71). The inspection and testing reports developed for each building were required to list, "at a minimum, facility number, [a] brief description of facility type or style (smoke stack, office building, control tower etc.), [a] comprehensive list of installed LPS system(s) and their respective locations and coverage of the facility it is installed on, [a] list of all tests performed, satisfactory and unsatisfactory results of the installation of the system or equipment or test results" (*id.* at 78).

2

5. The purchase order also required appellant to "develop isometric projection diagrams of each facility and inspected/tested system, and develop comprehensive reports from each inspection of and test of, each facility and its respective installed LPS system in its entirety, indicating each inspection and testing result for each system, and facility covered under this contract" (R4, tab 7 at 78). The purpose of the drawings was to "identify faulty or inadequate installations of, or deteriorated, broken, missing, or otherwise unsatisfactory installed parts of the LPS in order to make informed and required repairs in the future" (*id.* at 79).

6. According to the order, it was the appellant's "sole responsibility" to directly coordinate with the facility occupants for the scheduling of inspection and testing requirements (R4, tab 7 at 70). However, the contracting officer's representative (COR) could "assist with this if there are issues scheduling or coordinating with individual facilities as needed." (*Id.*)

7. The order set forth numerous requirements concerning access to the base. For example, it stated that all personnel entering must report to the visitor's center for a background check and a day pass (R4, tab 7 at 74). In the alternative, personnel working on an approved contract could apply for a Local Access Credential (LAC) card that would give them extended access to the base without going to the visitor center every day (*id.*). The appellant was to submit the LAC application form to the COR; the purchase order provided detailed instructions about the application process and a website to access the form (*id.*). The average time for standard background checks from submission until approval/denial was ten business days, and during busy times the average was one month. (*Id.*)

8. In addition, if the appellant was to use special equipment or lifts and booms in an inaccessible area or one designated as general parking to perform direct inspection and testing of installed systems for facilities, the appellant was to coordinate with the Ft. Leavenworth Provost Marshall/Military Police Traffic Section at least four days ahead of the scheduled work (R4, tab 7 at 73). The purchase order provided a phone number for the traffic section. (*Id.*)

9. In April and May of 2021, the agency emailed the appellant the government points of contact, information regarding LAC applications, and other information about accessing the facilities (R4, tabs 36-37, 40-41). Also in May of 2021, the government approved the appellant's LAC passes, but the appellant failed to pick them up in time and they expired (R4, tab 44). The appellant resubmitted the LAC applications and was given the option of obtaining day passes to complete the work (as explained in the purchase order) or reschedule the work once the long-term passes were approved (*id.* at 755).

10.  On June 22, 2021, the appellant asked the COR if the agency would provide a guide to work with them especially since heavy equipment would be used, and stated some of the buildings did not have a contact person and asked how to get access to the buildings to establish access and notify them of the impending work (R4, tab 8 at 102).  The COR emailed the appellant with the PWS sections explaining the coordination process (R4, tab 45 at 767).  The appellant also emailed the COR and stated it was waiting for LAC approval, missing contact information, coordination with military police, and a training waiver (R4, tab 47 at 771).  By June 25, 2021, the COR provided the appellant an updated points of contact list (R4, tab 48).  At this point, the COR emailed the contracting officer and expressed concern over the appellant's ability to perform (R4, tab 8 at 101-02).

11.  On August 13, 2021, the appellant provided the COR an inspection report for the LPS (R4, tab 9 at 112-13).  This was the beginning of the issues relating primarily to the isometric drawings.  On August 16, 2021, the COR responded and requested the isometric drawings and diagrams and the required test data (*id.* at 111-12).  That same day, the appellant responded and stated that it needed the original lightning protection as built drawings or, if those were unavailable, architectural or mechanical roof drawings with actual scaling (*id.* at 110).  According to the appellant, without this information, there "will be a price per building and a lead time associated per building based on the amount of engineering time required to produce" the documents (*id.* at 110).  There continued to be much back and forth about the isometric drawings (*id.* at 105-09).

12.  On August 18, 2021, the appellant asked for the height of each of the buildings and a modification of the contract to a cost-type, level-of-effort for a specified number of hours to be worked by engineering personnel (R4, tab 9 at 105).  On that same day, in an internal email, the COR explained that the heights were provided as approximates to the bidders to consider potential costs in buying or renting lifts and the omitted heights would be captured by the vendor at the time of inspection (R4, tab 10 at 122).

13.  On August 19, 2021, the contracting officer emailed the COR and others, expressing concern about the project and stating the appellant underbid in order to get this award, there were three acceptable quotations and the appellant's was $80,000 under the next acceptable quotation for the base period alone but the agency could not evaluate realism, and the agency could make the appellant whole by stating there was a mistake in the quotation (R4, tab 10 at 120-21).  The contracting officer stated it was likely the appellant would file a request for equitable adjustment (REA) and then a claim due to the specific language she used in her request for a modification (*id.* at 121).

4

14. On August 24, 2021, the appellant informed the contracting officer that the engineers created the isometric drawings despite the missing information relating to the height of each building, but this resulted in an additional cost (R4, tab 9 at 104). On August 27, 2021, the COR informed appellant the drawings were unacceptable because none showed the installed LPS or the test results (*id.*; R4, tab 11 at 136-37). The appellant resubmitted the drawings and test reports and they were again rejected (*see* R4, tab 12 at 138). This appears to be the beginning of the issues relating primarily to the inspection/testing requirements.

15. On September 7, 2021, the agency requested additional drawings and the inspection readings for all components (R4, tab 13 at 143). In response, the appellant stated the lightning protection inspection was performed as a visual inspection and could only be performed as such on the components, with a continuity test at the through roof connections, and no other testing could be performed (*id.* at 142-43). The COR responded that all systems can be tested to ground, as the PWS states, using an industry standard vibroground device and other means (*id.* at 141).

16. The next day, the agency again rejected the submitted drawings (R4, tab 14 at 145). On September 21, 2021, the appellant again sent the deliverables stating they "satisfy NFPA 780 inspections;" the agency accepted the deliverable the next day (R4, tab 15 at 149-50). The appellant then asked to proceed with close-out and payment, but was informed that there were still missing deliverables, namely, the test results (*id.* at 148-49). The appellant disagreed and stated that testing was performed under the requirements of NFPA 780. (*Id.* at 148)

17. On September 30, 2021, the appellant emailed the contracting officer and requested payment on its invoice (R4, tab 16 at 154). In addition, the appellant submitted an REA using the template prescribed by DFARS 243.205-71, Requests for Equitable Adjustment, again asking for a modification to a cost-type, level-of-effort purchase order for a specified number of hours to be worked by engineering personnel due to not having the requested information (*id.* at 154-55). The REA also stated that a specified number of hours increased due to requested coordination with officers for building access and other documents not foreseen in the original scope of work (*id.* at 155). The total requested was $12,700 (*id.*). On October 8, 2021, the contracting officer requested the appellant provide the specific amounts tied to a government-caused issue (*id.* at 152).

18. On October 26, 2021, the contracting officer emailed the appellant and others in the government and stated that there was a "dispute" about the testing requirements and that the appellant believed the previously provided inspection reports satisfied the contract (R4, tab 17 at 157). The government maintained that ground testing was required, and not provided by the appellant. (*Id.*) On October 27, 2021,

5

the appellant submitted an invoice for isometric drawings in the amount of $11,543.75; the invoice was accepted the same day (R4, tab 30).

19. On November 30, 2021, a different contracting officer issued a COFD regarding appellant's September 30, 2021 email asserting it provided all deliverables and requesting payment in full (R4, tab 18 at 159). The COFD stated the purchase order was ambiguous regarding the type of testing required such that while the PWS references NFPA 780 and DA Pam 385-64 "there is not an immediately clear correlation in the statement of what tests are to be performed nor what tests are referenced or a location within the specifications to locate applicable testing. . . ." (*Id.* at 160). However, because the appellant waited more than 90 days to challenge the ambiguity, it was required to perform the testing on the LPS (*id.*). The contracting officer asked the appellant to provide a revised schedule regarding the testing by December 3, 2021 (R4, tab 19 at 178). The COFD also stated that the REA relating to coordination of access to facilities would be handled as a separate matter (R4, tab 18 at 159).

20. On December 1, 2021, the appellant requested a meeting (R4, tab 19 at 172-73). In addition, the appellant submitted a new report (*id.* at 169). The contracting officer stated that it appeared to be the original report and requested a report with the ohm value readings which were needed to determine LPS compliance. (*id.* at 168) The appellant informed the agency that it subcontracted the testing work and it would be performed the week of January 17, 2022 (*id.* at 162, 166).

21. On February 18, 2022, the agency held a teleconference with the appellant to discuss the partial acceptance of the deliverables (R4, tab 21 at 182). According to the meeting minutes, the appellant stated the former contacting officer informed her by telephone that she only needed to provide the minimum deliverables which she had already provided, and there was no requirement to provide additional data (*id.*). The appellant also stated that the government must meet with her subcontractors and walk them around each facility to show them what the government wanted (*id.*). In response, the government stated that there were no documented or verbal discussions with any of the assigned contracting officers that changed the scope of the work or deliverables which were relayed to the COR (*id.* at 183). The government also stated that the facilities, locations, and access processes were in the PWS and the appellant has had access to each facility as confirmed by its own prior admission (*id.*). The agency agreed to pay a portion--$8,338.05--of the remaining balance due to the partially accepted test result deliverables (*id.*).

22. On March 9, 2022, the contracting officer asked the appellant for more details concerning the September 30, 2021 REA, such as the hours not included in the original scope, the personnel not available, and the documentation to be provided that was out of scope (R4, tab 24 at 194). In response, the appellant stated that only roof

6

testing was required but the agency insisted on ground testing per the November 30, 2021 COFD, and the blueprint of the original installation of the LPS was never provided (*id.*). The appellant failed to address the allegations relating to access to government buildings.

23. On March 13, 2022, the agency issued a COFD on the September 30, 2021 REA (R4, tab 22 at 185-86). The agency disputed the REA and concluded the PWS did not state a requirement for the government to provide drawings or blueprints for the LPS but stated the appellant was required to provide a drawing of each facility (*id.* at 185). The COFD did not address any issues relating to base access.

24. On March 16, 2022, the agency and appellant held another meeting, which included the appellant's subcontractors, to explain what test data was still due (R4, tab 23 at 189). The government insisted the appellant test every installed LPS component and sub-component for electrical resistance (*id.*). The appellant argued that the government was asking for deliverables not required by the purchase order, that all deliverables provided to date satisfied the order, and the government was requesting items which were not "industry standard acceptable practice" and impossible to provide (*id.* at 190). The government disagreed and stated that it received this exact same product on another contract (*id.*). The parties did not resolve their issues and the appellant insisted it did not owe the government anything more. (*Id.*) Nonetheless, the appellant continued work on the purchase order.

25. On March 25, 2022, the COR spoke with an individual working for the appellant to discuss the LAC/pass process and how to maneuver the boom on the streets (R4, tab 68 at 1013). On March 30, 2022, the agency sent the appellant and a subcontractor links to webpages on visitor access to the base such as the visitor's office hours and location and pass requirements (R4, tab 67).

26. On March 31, 2022, the appellant's subcontractor stated it needed a larger boom lift because it was missing needed information (R4, tab 26 at 218-19). In response, the appellant asked the subcontractor to confirm that the building dimensions originally sent were insufficient to determine the building heights because she need to justify the additional costs for equipment and labor (*id.* at 218). On that same day, the subcontractor confirmed that the information was not enough to gauge the size of the boom lift required (*id.*).

27. Also on March 31, 2022, the appellant emailed the contracting officer with an REA seeking $97,370 for missing information not provided by the agency, which caused an increase in overall costs such as manpower and equipment (R4, tab 26 at 207). The REA listed a cost of $24,470 for the inspection of all 18 buildings and inspection reports to "include any necessary remediations;" $34,800 for isometric drawings due to missing information from the agency; and $38,100 for the cost of

additional testing and measurements due to missing information from the agency (*id.* at 209). It included a copy of a check to Lightning Masters Corporation, a copy of a wire transfer to Scientific Lightning Solutions, LLC, and various emails relating to missing building heights (id. at 210-14, 217). The appellant informed the contracting officer that it was "going this route of Equitable Adjustment rather than a different route for now because I want to preserve a good working relationship with your team" (*id.* at 208).

28. In early April 2022, the appellant informed the government it could not finish the work due to weather conditions and trying to get cars moved or maneuvering the boom around parked cars (R4, tab 68 at 1011-12). On April 5, 2022, the appellant emailed the COR and asked to work the weekend to complete the job (*id.* at 1011). The contracting officer approved the request, but reminded the appellant to read the PWS, especially the sections relating to hours of operation, parking, weather conditions, and coordination with the traffic section (*id.* at 1010). The contracting officer stated she was not granting any additional money for overtime work. (*Id.*)

29. On April 8, 2022, the agency issued a COFD denying the REA (R4, tab 27). According to the COFD, the PWS: (1) required the appellant provide remedies and solutions for substandard or deficient systems or components; (2) stated the appellant would provide the government isometric drawings; and (3) stated the appellant would provide testing and measurements of the buildings (*id.* at 221). The COFD stated the government provided building heights for the five tallest buildings in technical exhibit A, and therefore appellant had knowledge of the appropriate equipment needed. (*Id.*)

30. On April 11, 2022, the appellant emailed the contracting officer and stated "see attached claim" (R4, tab 28 at 223). The claim consisted of a claim summary schedule (setting forth costs for direct labor, staff payroll, general and administrative (G&A) expenses and profit), and several corresponding invoices, and requested a total amount of $97,370 (*id.* at 224-31). Specifically, the appellant attached the following invoices: (1) $7,625 from Bolt Lightning Protection for testing, travel, and ground readings on 13 buildings; (2) $18,470 from Lightning Master for inspection of all 18 buildings, lift rental, travel, inspection reports to include necessary remediations required to bring LPS up to industry standard per NFPA 780; and (3) $24,012.58 from Scientific Lightning Solutions, LLC for a feasibility study for lightning protection and surge protection with notes that the building heights were not provided so the assumption was a 60-ft boom lift was required (*id.*).

31. On April 13, 2022, the agency issued a COFD on the claim (R4, tab 29).[1] First, with respect to the $7,265 for the test reports and grounding readings, the government denied the claim because the testing and inspection services were required by the PWS (*id.* at 233). The COFD also stated: "Additionally, there is no evidence in the contract file that the contractor posed any questions related to testing and inspection that would warrant an increase in costs" (*id.*). The government also denied the claim seeking $18,470 for testing and inspection reports and isometric drawings (*id.* at 232). According to the government, the PWS required the appellant provide all supplies, equipment, management and labor personnel to perform inspection and testing services for the specified buildings; and the appellant was to provide remedies and solutions to get substandard or deficient systems or components within acceptable standards along with a scale isometric projection drawing of each facility listed in the TE (*id.*). The government stated that the appellant had an opportunity to account for these costs in its quotation and again stated that there was no evidence in the contract file that the appellant posed any questions on the testing and inspection procedures that would warrant an increase in costs (*id.*).

32. The government also denied the request for $24,012.58 for a feasibility study, which included providing measurements for all buildings listed in the PWS (R4, tab 29 at 233). According to the government, the PWS required testing and measurements of the buildings (*id.*). The government also denied the requests for staff payroll, G&A, and profit because the PWS required the appellant provide all supervision, management, tools, equipment, and labor necessary to perform inspection and testing services (*id.*). The contracting officer concluded by requiring the appellant provide the required testing of the LPS (*id.*).

33. On April 22, 2022, the appellant emailed Thomas Prayne and stated that testing and inspection would be conducted on April 25-26, 2022 and that all stakeholders had been informed and vehicles will need to be parked away from the building to allow access (R4, tab 71 at 1029). On April 22, 2022, Mr. Prayne stated that he could provide the appellant cones but the appellant would have to pick them up (*id.*). On April 25, 2022, the appellant informed the COR she was having problems with access to certain buildings (R4, tab 70 at 1022-23). The COR asked the appellant if she had coordinated with the military traffic section to have the areas coned off, as described in the PWS (*id.* at 1022). The appellant then forwarded her email to Mr. Prayne and asked for assistance in accessing the buildings (*id.* at 1022).

34. On May 18, 2022, the appellant filed a Notice of Appeal on the COFD on the REA, which the Board docketed as ASBCA No. 63292. On May 25, 2022, the

---

[1] The government found a discrepancy in the amount requested and provided a response to each of the amounts requested in the various invoices (R4, tab 29 at 232).

appellant filed a Notice of Appeal filed on the COFD on the claim, which the Board docketed as ASBCA No. 63293.  On May 31, 2022, the appellant submitted a final invoice for final testing in the amount of $11,543.75; the government accepted the invoice on June 3, 2022 (R4, tab 31 at 239, 243).

35.  On June 21, 2022, the appellant, this time through counsel, submitted a Statement of Clarification to the Board explaining that the two "claims" submitted initially by the *pro se* owner are for the same amount of $97,370 and therefore within the monetary limits for expedited procedures (app. corr. dtd. June 21, 2022).  On July 19, 2022, the appellant submitted a Second Statement of Clarification explaining that the March 31, 2022 REA and April 11, 2022 claim submitted by the appellant to the contracting officer "are for the same matters and based on the same allegations, which shows why the amounts claimed in each are identical."  (App. corr. dtd. July 19, 2022)

36.  In its amended complaint, the appellant alleges the following:  (1) there was promissory estoppel because the contracting officer verbally modified the solicitation prior to award when it informed the appellant during a call that the solicitation only sought annual inspection services which the appellant says "would only consist of visual inspection services in accordance with NFPA 780"(amended compl. ¶¶ 30-37); and (2) the government breached its implied duty of good faith and fair dealing when it failed to cooperate and prevented the appellant from accessing the site to conduct work under the contract, resulting in wasted expenditures on labor, equipment and subcontractors (amended compl. ¶¶ 38-43).

DECISION

The government has made several arguments that the Board lacks jurisdiction over the appeal.  First, the government argues the appellant never submitted a "valid" claim to the contracting officer.[2]  The government contends the April 11, 2022 correspondence was "simply seeking reimbursement of its costs as if the Contract were cost-reimbursement type, rather than firm-fixed price type, similar to the appellant's efforts in its March 31, 2022 REA" (gov't reply at 12).  The government further contends the April 11, 2022 communication fails to provide clear language providing the basis of the claim (gov't mot. at 11-12; gov't reply at 12-13).

_____

[2] The government has moved to dismiss the appeals by arguing that the April 11, 2022 submission is not a "valid" claim and only averring that the March 31, 2022 submission is an REA even though the agency issued COFDs for both (*see e.g.,* gov't reply at 14-16).  As noted, Selevive appeals both COFDs and asserts that the two are for the same matters and based on the same allegations; the Board consolidated the appeals.  Further matters, if any, relating to the March 31, 2022 REA will be addressed in a decision on the merits.

The appellant argues that it submitted a claim as evidenced by the earlier correspondence and communications which preceded the claim, along with the claim itself (app. resp. at 11-15). According to the appellant, these documents provided a clear statement of the basis of the claim, and the contracting officer understood the basis of the claim, as evidenced by the COFD (*id.*).

Selevive bears the burden of establishing jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir. 1988) (citations omitted); *CCIE & Co.*, ASBCA Nos. 58355, 59008, 14-1 BCA ¶ 35,700 at 174,816 (citing *Hanley Indus., Inc.*, ASBCA No. 58198, 14-1 BCA ¶ 35,500 at 174,015). "The facts supporting jurisdiction are subject to our fact-finding upon a review of the record." *CCIE & Co.*, 14-1 BCA ¶ 35,700 at 174,816 (citing *Raytheon Missile Sys.,* ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,016).

*Is the April 11, 2022 correspondence a claim?*

The FAR defines a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." 48 C.F.R. § 52.233-1(c). Claims under $100,000 need not be certified. 41 U.S.C. § 7103(b)(1); *see* 48 C.F.R. § 52.233-1(d)(2)(i). The FAR also explains that "[a] voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under 41 U.S.C chapter 71." 48 C.F.R. § 52.233-1(c). To determine whether a claim was submitted, "we apply a common sense analysis, looking at specific communications on a case-by-case basis and the 'totality of previous correspondence between the parties.'" *Kellogg Brown & Root Servs., Inc.*, ASBCA No. 62681, 21-1 BCA ¶ 37,974 at 184,427 (quoting *Holmes & Narver, Inc.*, ASBCA No. 51430, 99-1 BCA ¶ 30,131 at 149,054).

The April 11, 2022 submission is a claim. It followed the COFD denying the March 31, 2022 REA which likewise sought $97,370 for, among other things, inspection and testing. Further, the April 11, 2022 submission followed months of conflict between the appellant and government over many things including the requirements for testing. Based on the record before us, as far back as February 18, 2022, the appellant disputed the requirement to perform ground tests on the LPS due to an alleged conversation she had with the contracting officer (SOF ¶ 21). Accordingly, the April 11, 2022 submission sought compensation due to alleged unforeseen or unintended circumstances and is therefore not a routine submission made "'in accordance with the expected or scheduled progression of contract performance.'" *James M. Ellett Constr. Co., Inc.*, 93 F.3d 1537, 1542 (Fed. Cir. 1996) (quoting *Reflectone, Inc., v. Dalton*, 60 F.3d 1572, 1577 (Fed. Cir. 1995)).

11

*Was there a clear and unequivocal statement providing adequate notice of the claim?*

The government contends the claim never specifically referenced anything relating to the first allegation in the complaint--the alleged pre-award clarification call with the contracting officer--and is only a table of expenses and several invoices which failed to explain their relevance (gov't mot. at 2-3, 11; gov't reply at 20-21). "A claim need not be submitted in any particular form or use any particular wording, but it must provide a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Tolliver Grp., Inc.*, 20 F.4th 771, 776 (Fed. Cir. 2021) (quoting *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015)). In addition, "[i]n determining a claim's scope, we are not limited to the claim document but can examine the totality of the circumstances." *Dawson-Alamo1 JV, LLC*, ASBCA No. 60590, 19-1 BCA ¶ 37,357 at 181,645 (quoting *Sauer, Inc.*, ASBCA No. 60366, 16- 1 BCA ¶ 36,565 at 178,101).

When looking at the circumstances in total, the April 11, 2022 claim provided adequate notice that the appellant was contesting the scope of work due to prior discussions with the contracting officer. Again, the record shows that during a February 2022 meeting, the government disputed appellant's allegations that any of the assigned contracting officers had discussions that changed the PWS or deliverables. (R4, tab 21 at 183) The appellant then submitted what it labeled an REA on March 31, 2022, listing as relevant here a cost of $24,470 for the inspection of all 18 buildings and inspection reports and $38,100 for the cost of additional testing (R4, tab 26 at 207, 209). The agency issued a COFD denying the REA, contending the PWS required testing (R4, tab 27). Next, on April 11, 2022, the appellant submitted the claim at issue here which included invoices for testing and inspection reports (R4, tab 28). In response, the COFD specifically states *twice* that there was "no evidence in the contract file that the contractor posed any questions" related to testing and inspection that would warrant an increase in costs (R4, tab 29 at 232-33). Therefore, the government was aware of the basis of the claim, at least as it relates to the requirement for more than visual inspections.

With respect to the second allegation that the government failed to cooperate and prevented the appellant from accessing the site, the government argues the claim says nothing about these issues relating to base access (gov't mot. at 9; gov't reply at 22). The record shows the appellant had raised this issue as far back as September 2021 (R4, tab 16 at 155), and the issue concerning access to facilities was apparently discussed again during the teleconference on February 18, 2022 (SOF ¶ 21). However, on March 9, 2022, the contracting officer requested a detailed response regarding the REA in which this issue was raised and asked for "personnel not available"; the appellant failed to provide information regarding access to the facilities (SOF ¶ 22). Further, the March 31, 2022 REA seeking $97,370 for missing information and the cost of inspections and additional testing failed to set forth any

allegations regarding lack of access to the buildings (SOF ¶ 27). Likewise, the subsequent April 11, 2022 claim seeking $97,370 for testing and inspection and other costs never discussed this issue (SOF ¶ 30). While there is communication in the record showing in late April 2022 that the appellant believed there were base access issues, these occurred after both COFDs. Accordingly, the claim failed to provide adequate notice of this allegation to the contracting officer, and this allegation is dismissed.

*Is this the same claim as presented to the contracting officer?*

The government also moved to dismiss the appeals arguing that the causes in the complaint are not based on the same operative facts and basis of the claim submitted to the government for a COFD (gov't mot. at 8-10; gov't reply at 12). The Contract Disputes Act requires that "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). The purpose of presenting a claim to the contracting officer first is "to create opportunities for informal dispute resolution at the contracting officer level." *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 776 (Fed. Cir. 2021) (quoting *Raytheon Co. v. United States*, 747 F.3d 1341, 1354 (Fed. Cir. 2014)). Because "'[t]he scope of [an] appeal is determined by the claim originally submitted to the contracting officer for a final decision'. . . . we do not possess jurisdiction over new claims that were not previously presented to the contracting officer." *Parwan Grp. Co.*, ASBCA No. 60657, 18-1 BCA ¶ 37,082 at 180,495 (quoting *MACH II*, ASBCA No. 56630, 10-1 BCA ¶ 34,357 at 169,673).

A claim presented to the Board may be considered the same as the one presented to the contracting officer if it "derives from the same set of common or related operative facts" and "seeks the same or similar relief." *Anthony and Gordon Constr. Co.*, ASBCA No. 61916, 21-1 BCA ¶ 37,887 at 184,001 (quoting *Parwan Grp. Co.*, 18-1 BCA ¶ 37,082 at 180,495). In general, we look at the "operative facts" of the claim submitted to the contracting officer, which are "the essential facts that give rise to the cause of action." *M.A. DeAtley Constr., Inc. v. United* States, 75 Fed. Cl. 575, 579 (2007) (quoting *Kiewit Constr. Co. v. United States,* 56 Fed. Cl. 414, 420 (2003)).

In addition, a claim that introduces "additional facts which do not alter the nature of the original claim" or asserts "a new legal theory of recovery, when based upon the same operative facts as included in the original claim" does not constitute a new claim. *Trepte Constr. Co. Inc.*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385. The claimant is free to change its legal theory as long as it is not materially different from what was presented in the claim. *Wilwood Eng'g*, ASBCA No. 62773, 22-1 BCA ¶ 38, 116 at 185,144.

Selevive's complaint argues there was promissory estoppel because the contracting officer verbally modified the solicitation prior to award when it informed the appellant during a call that the solicitation only sought annual inspection services which the appellant says would only consist of visual inspection services in accordance with NFPA (amended compl. ¶ 30-37). "[P]romissory estoppel is essentially an equitable cause of action whereby one who reasonably relies on another's promise can subsequently require that person to make good on his promise." *Carter v. United States*, 98 Fed. Cl. 632, 638 (2011). Although Selevive did not specifically articulate, or use the words, promissory estoppel in its claim, the Army understood the claim was based on the appellant's reliance of alleged oral advice from a contracting officer. Accordingly, we conclude that Selevive did present this theory of recovery in its claim to the contracting officer.

The parties were asked to provide briefing on whether the Board has jurisdiction over the appellant's allegation of promissory estoppel. The government contends that the Board does not have jurisdiction.

"An obligation based upon promissory estoppel is a type of contract implied-in-law. . . and cannot be asserted against the government." *RGW Commc'ns., Inc. d/b/a Watson Cable Co.*, ASBCA Nos. 54495, 54557, 05-2 BCA ¶ 32,972, at 163,338 n.13 (citations omitted). A contract implied-in-law is one "in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice." *International Data Products Corp. v. U.S.*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). The Board does not possess jurisdiction over a contract implied-in-law, and therefore we do not possess jurisdiction over a claim of promissory estoppel. *See Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,534. Here, the appellant has argued that it relied on information provided by the contracting officer prior to award, and the appellant "adjusted [its] proposal to only account for visual inspection services" (amended compl. ¶ 36). As the promissory estoppel allegation concerns an implied-in-law contract, we dismiss for lack of jurisdiction.

In its brief, the appellant argued that "this situation is unique as it is one where an express contract was made. . . [and] Selevive's claim can be more properly described as one for negligent misrepresentation" (app. br. at 1). The appellant has sought to amend its complaint (app. br. at 2). Accordingly, as appellant has raised an additional issue that requires further briefing, the appeal remains before the Board and that issue will be resolved at a later time.

CONCLUSION

For the foregoing reasons, the government's motion on jurisdiction is granted in part and denied in part, and the Board dismisses the allegation regarding promissory

14

estoppel. Accordingly, ¶¶ 31 through 32, and 38 through 43 are stricken from the amended complaint.

Dated: October 18, 2022

_____
LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 63292, 63293, Appeals of Selevive Group, LC, rendered in conformance with the Board's Charter.

Dated: October 18, 2022

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals